Thank you, Your Honor. May it please the court. I'd like to reserve two minutes for rebuttal. My name is Douglas Gelay, and I am the representative for the petitioner, Guillermo Avila-Arias. This case comes down to two issues. Given that the board decided not to address the petitioner's credibility, the court should assume petitioner is credible. And the facts of his testimony are credible and given proper evidentiary weight. I think as we look at this case as a whole and the two issues that I'm going to address, I think the credibility is a critical point that will ultimately take the day for Mr. Avila-Arias. The first issue is whether or not in this particular case, the imminent threat of death rises to the level of past torture. And the second issue is whether or not Mr. Avila-Arias can safely relocate within Mexico to avoid torture from the La Unión cartel that basically is based out of Mexico City. Let me just ask you right, just to get this moving, on your first argument, are you arguing that the board's decision is not supported by substantial evidence, or are you arguing that there was legal error? I'm arguing that there was legal error. They cite to the regulation, which includes the threat of imminent death. They're not following their own regulation. And also, it's both, Your Honor. It's also not supported by substantial evidence. We know from the regulation that the imminent threat of death rises to the level of past torture. And in this case, we have Mr. Avila-Arias, who had a gun to his head twice from the, one of the most, and this is all part of the evidence of the record, one of the most vicious, violent cartels in Mexico that controls everything that goes in and out of Mexico City the largest city in Mexico, and one of the largest cities in the world. And the government and the board tried to downplay these two instances. The way I look at the threat of imminent death in relation to torture is that it's a spectrum. On one end, we have, you know, a spouse telling another spouse, hey, I'm going to kill you. And it's a joke. On the other end of this spectrum, we have Mr. Avila-Arias. It's not a joke. We have the Morelos, excuse me, the La Union cartel is telling Mr. Avila-Arias, look, we killed your brother. You keep pushing the investigation. We're going to kill you. That's the first time. And then the biker flies off. Mr. Avila-Arias is so terrified that he relocates to Tijuana and they find him. Now, another point that the board and the government tried to make. Can I just to clarify. So since you're saying there's also there's legal error and that, I guess, the substantial doesn't mean substantial evidence on the legal error aspect. Is your position that I hear what you're saying. On one hand, you know, somebody could be joking or something, I guess, about a death threat. But is your position that if it's not a joke, if it's a legitimate death threat, that that is always. No, no, Your Honor, it's not. No, I'm talking about Mr. Avila-Arias is at the other end of the spectrum. He's a child. Let me see if I can understand if that's not your position, I didn't think it was, then it doesn't seem like it's a legal error as much as it is a substantial evidence issue. Like, you know, is there is the board's decision here that this was not torture? You know, is it supported by the evidence or to put it the other way that we say in our case law, does the record compel the opposite conclusion that this was torture? So I have a problem with the legal aspect of it. I'm arguing both, Your Honor, that it's so egregious that it's they didn't follow their own. They don't acknowledge that imminent threat of death is, can rise to the level of torture. The board's decision does not acknowledge that. So I will continue to argue it. But as far as the, whether it's under substantial evidence or whether it's under legal error, I think it's somewhat of a fine line. And that's why I'm arguing both. But you know, when I read your brief, I didn't see substantial evidence mentioned in your brief. I believe that in both of my issue statements, Your Honor, that substantial evidence does not support the board's decision. Let me, let me, let me, what, so in your view, what is the legal error? I mean, I thought it had to deal with, you know, in the board's analysis, the board's, the board said, well, we're sympathetic to the mental pain caused by the applicant, caused the applicant by these events. Does this level of harm is not torture? And then the board goes on to reference, the applicant was not present and did not witness the murder of his brother. There's insufficient evidence that the criminal gang ever threatened that prior to his brother's death. I couldn't figure out if that was your argument, which was that they, they raise these factual points that just really don't have anything to do with the fear that he suffered. That's yes, Your Honor. That's exactly right. They, I was quite perplexed by that point that I think the brother's death and the threats that came after is even more so to the gravity and the ability of the La Union cartel to carry out these threats. And that's ultimately, I think where the analysis goes is the imminent threat of death, it has to have power behind it. And I'm, I'm basically arguing that this threat to Mr. Avila-Arias, these two threats, they had the most power possible behind it. And whether the board committed legal error by not following its own regulation or by, or substantial evidence error by botching the facts, I'm arguing both. And I, so I'll, I'll continue if I, if I may. Um, Mr. Avila-Arias is at the other end of the spectrum. He flees all the way to Tijuana and they still find him. Now there's a, there's a slight point about, well, uh, somebody who said they were law enforcement called him and that's how they got his address. And well, he's never going to do that again. So where do we draw the line there? If Mr. Avila-Arias tries and goes and gets a driver's license, should he trust the driver's license government authority enough to give his address? I mean, I don't think the real issue on, um, and I'll, I'll move now to, um, relocation is not, is he going to give his address out again to somebody who's posing, um, as a government authority or who is possibly a corrupt government authority and going to give his address out to the It's whether or not he can live in peace in another part of Mexico where La Union Cartel would not find him and whether or not the La Union Cartel has the power and the, and the ability to go chase him down in another part of Mexico. He is credible. We know that that happened. So I think that issue is conclusive. It doesn't matter that he accidentally gave his address out to a government, somebody who said they were a government authority. It matters that they had the ability to go and find him and put a gun to his head and attempt to kill him. So not only is this just an imminent threat of death, it's also an attempted murder. And the only reason they didn't kill him is because there were a bunch of government, government authorities standing around. And I will also note that, um, government acquiescence was not an issue in this case. And I'll reserve my last minute. Thank you. Okay. That's all right. Let's, we can hear from the government now. Good morning. It may have pleased the court, Greg Mack for the attorney general. The evidence does not compel the conclusion that petitioner is eligible for deferral of removal under the cat. The key points here are prolonged mental harm and relocation. Substantial evidence supports the agency's determination that petitioner's concerns arising from the murder of his brother, the one minute incident at gunpoint in Mexico city, and an attempted kidnapping in Tijuana did not constitute the kind of prolonged mental harm caused by the threat of imminent death contemplated by the cat regulations. Regarding relocation, petitioner's own expert indicated that the La Union cartel that killed his brother primarily operates in and around Mexico city, said 298 of the record, the expert could not unequivocally confirm that the cartel has active cells outside of Mexico city. And that's at 196 and 197 of the record. And petitioner was found in Tijuana only after he voluntarily provided his address to someone purporting to be from the police. So with respect to, I think the court had questions of my brother colleague there about what are the actual issues here and whether further torture was addressed. I think if the court goes to his appeal brief at page 14 of the record, what was pitched to the board was past torture. And so the board addressed what it was put before it and the board concludes on page four of the record, this level of harm is not the type of extreme and prolonged cruel and inhuman treatment contemplated by the convention against torture. And so what was pitched to the board was mental pain and suffering. And that's what the board analyzed and said this sort of mental pain and suffering wasn't the sort of prolonged mental harm arising from or caused by the threat of imminent death. So that's with respect to the torture analysis. And again, on relocation, the reason why he was found in Tijuana, which of course isn't the only city in Mexico, is because he inadvertently gave his address to somebody purporting to be a police officer. So he was found out by his own hand or his own voice at giving his location away in Tijuana. And the expert testified or couldn't unequivocally confirm that there are active cells of this particular Mexico City cartel operating in Tijuana. So it's not the sort of prolonged sort of harm contemplated by this. Mr. May, can we go back to the torture issue in the board's decision in the little quote that I that I read? Yeah. You know, they make a point of emphasizing that he didn't witness certain events prior to. What's the relevance of that? They say that the applicant was not present and did not witness the murder of his brother. Well, it was it was pitched. What does that have to do with the with the torture that or the fear that he experienced when he was threatened? Well, it has to deal with the larger circumstances here and what the board is looking at is what was pitched to them in terms of a mental pain and suffering case. The anguish that petitioner alleged to the board and the board is saying, well, look, you were not present at your brother's murder. And then they go on to the other incidents involving his his actual contact with the gang, apart from being in the bar, his actual contact with the gang was one minute during this motorcycle encounter in Mexico City and the event in Tijuana, which was essentially over before it even started because they encountered the police. So the board's reference there is what you pitched to us was your mental pain and suffering. Well, you weren't present at your brother's death. So that's the point that they're making there. But I think the larger points that they go on to is dealing with the actual contact that he had from a from from from from the from the cartel in Mexico City with the individuals on the motorcycle and the individuals in Tijuana. And on those, the record does not compel. But counsel, can I just to be to clarify something with respect to Judge Paz's question, I did not go back and read the petitioner's brief in front of the board, but that the petitioner argued in front of the board that he that his that this rose to the level of torture because of his anguish from his from his brother being killed. Just bringing up or looking at it again, he says the first sentence in his appeal brief is the immigration judge found that even if responded was for petitioner was credible that he was not subject to pass torture when the La Union cartel threatened him with death after murdering his brother. And then there's a long sense about what the cat requires. And it says the reservation states that mental pain or suffering refers to the prolonged mental harm caused by resulting from the intentional infliction or the threatened infliction of suffering. And then he goes on to cite Nehru versus Gonzalez. And he basically cites the rest of the regulation. So he is driving. Are you read which brief you're reading? You're reading his brief in front of the BIA. Correct. At page 14 of the record. So he pitches it to the board as a mental pain or suffering case in a past torture case. And he cites the regulation or basically quotes the regulation and then cites Nehru Nehru versus Gonzalez. And he directs the board to a footnote note five, which is basically just a repetition of the mental pain and suffering regulation. So this is pitched to the board as mental pain or suffering. So the board, of course, addresses what he pitched to the judge. Pious question. What the board is getting at is, well, if you're saying it's an anguish and pain and the board is responding, you are present at your brother's murder, which is accurate. That's a choice. But I thought that the whole his whole argument was that he was threatened following, you know, and along the way in the context, his brother was, you know, was. An issue, but his whole point I understood was to the regulation, which does state in order to constitute torture, mental pain or suffering must be prolonged mental harm caused by resulting from. And I thought he was pointing to three, the threat of imminent death. And I agree with the threat of imminent death, and I think what we pointed out in our brief and what the board board refers to is there's this one minute contact in Mexico City with two individuals on a motorcycle at gunpoint and the incident in Tijuana, which I would submit was over before it was not the sort of prolonged mental harm and suffering that is arising from the threat of imminent death, given the short duration of these particular incidents. So I think, again, in responding to the petitioner's argument to the board in terms of mental pain and suffering, the board's saying, look, with respect to your anguish or pain arising from this, these circumstances, you weren't present at your brother's murder. You're present at your brother's murder. Certainly, I think that were a different fact. The board might say, well, well, we'll take that into account in your mental pain and suffering. But they say, no, you weren't present at your brother's murder. But then they do go on and address the facts with respect to the Tijuana and Mexico City incident. So the board addresses the full the full picture here. And again, I would stress with respect to relocation, he's not found in Tijuana City again, which is not the only city that you could relocated Mexico and the great city, great country of Mexico. And unless and he was there for several months without incident. And the only reason they located him in Tijuana is that he reveals his location soon to the gang. And the expert could not unequivocally confirm that it has active cells in Tijuana. So overall, given these circumstances and given the standard of review, let me ask you this, Mr. Mac, what was the basis for the board disregarding or giving virtually no weight to the opinion of the of the expert? Well, I think they give weight to what the expert says. But they say the experts primarily active in Mexico City. And the board notes that while La Union has cells in different areas of Mexico City, you could not recall where those cells were located. And as I pointed out in our brief, the expert couldn't unequivocally confirm that there are active cells in cities outside of Mexico. But wasn't the experts talking about, you know, the system that the way in which they share information and whatnot? Yes, he did say that the whole basis for his opinion or part of his opinion. Yes. I'm sorry, your honor for talking over you. But yes, he says that they have an infrastructure. But he also said on crossings brought on a cross examination. He couldn't confirm whether there are active cells outside of Mexico City. So given that record and given the court standard of review where you have both sets of facts going on, the standard review says the petition should be evidence of determination. Can I can I interrupt you? But he said that I can. He said he couldn't specifically say right now whether there was a cell, nothing coming to mind. Then he says, quote, but the infrastructure is there for them to seek restitution against their enemies throughout Mexico. That's the very nature of these criminal cells. And then he said a little bit earlier that it is absolutely possible and I would say even likely that they would find petitioner if he did not live in Mexico City. It is highly likely that this organization would seek retribution against them because they see him as someone who is actively seeking justice against them. And he says there is an infrastructure there for them to seek retribution against their enemies throughout Mexico, even though he couldn't think of an active cell particularly. Period. So he says there's an infrastructure there for them to seek retribution and it's possible and they would. I say I might have time, but I'll go ahead and respond to the court's plea. The fact finder has both sets of facts. The expert says nothing comes to mind. I don't I don't have nothing comes to mind with respect of active cells anywhere else in Mexico. And Judge Corbin, certainly the expert says all those other things about infrastructure. So what does the fact finder get to do? They get to decide between different facts. That's what the agency did here. And given the standard of review, that means this court has to find that substantial evidence supports the agency's determination. Can I ask one? Go ahead. So I had read this, the same testimony that Judge Corbin just talked about and also read, read his expert's declaration. And as I read it, you know, the expert, especially in his declaration, talks at length about how he's known others in the city. He would be easily capable. The group would be easily capable to identify him as soon as he arrived in Mexico City. There's a lot of language like that. But then he's got what reads to me kind of like little afterthoughts, he says. He says he either location would place him in further danger of being harmed or killed because he's wanted for being a snitch. So it's a little bit conclusory. But and the same thing with his testimony. So I'm trying to figure out what to do with if an expert is testifying both in declaration and testifying in person. What do what do we do or what does the fact finder do if the expert says in sort of conclusory faction, oh, yeah, they could find him anywhere, which is basically what I see here. Most of the testimony is about what makes sense. And the details are about they would know where he is. You know, they would identify him because he's known his brother was a bar owner, etc. in Mexico City. But but but also he'd be like on page 251. It says other especially other gang members operating in Mexico City and anywhere in Mexico for that matter. Right. So it's kind of like a throwaway. What what is the fact is the fact finder like bound to for something that sounds conclusory and sort of like a tack on? No, the fact finder isn't bound to accept all the facts. The fact finder is any trial judge or tribunal gets to decide, OK, I accept this fact or I don't accept a particular fact. But I think what's important at this level, the court is sitting as review, not as the trier of fact. And the agency has made its determination about which facts it finds credible and which facts it finds conclusion. And I think, frankly, what's happening here is the expert. You could have given that testimony and expert opinion declaration in any immigration case. But when it comes to the question of this particular case, this expert says, well, I can't really confirm that there's any active sales outside of Mexico City. And then to the point about, you know, well, it seems like they would find this person in Mexico. The board at page four cites to the attorney general's and attorney general's decision a matter of J.F.F. and saying that applicant has not met his burden to demonstrate that each link in the hypothetical chain of events would actually exist here. And that's a page again for dealing with that hypothetical chain. Well, if he shows up in Mexico, he's automatically going to be Mr. I have one last question for you. And we'll have to move on. But do you think the board's opinion matches up with what we recently said in Castillo versus Barr about experts? I'm not sure. I don't know. I don't think it was cited by either party. I don't know if it's a recent case. It just came out. Yeah, I don't know. I am not familiar with the case. And I'd have to take a look at it. And it's an opinion by Judge Wallace. And certainly the board didn't have to steal Wallace. I don't think when they issued this decision. So I don't I don't have an opinion. I'd be happy. All right. That's fine. Thank you. Are we trying to hear from the petitioner now? Your honors, I would ask you two minutes for rebuttal. Thank you. Thank you, Your Honor. Thankfully, Judge Corman cleared up one of my issues. Government says that he revealed his address to the gang. He did not do that. He's not saying I'm in Tijuana. Come get me. That's just not a correct assessment of the facts. He and I think the court knows that. And I think that's the part of the whole point is that they had the ability. And I said at the beginning and I'll say again now, credibility is the critical link here. I.J. didn't find him credible, but that was erroneous to the board. Didn't touch it. I guess they reserve the right to touch it again if they want to. But given that he's credible and given at page 112 of the record that when he was threatened the first time, they told him stop pushing the issue. These weren't just random people who came and threatened him with a gun on a bike for no reason. There's verbal exchange there. Stop pushing the issue. Stop investigating the death of your brother. That's intentional threat of death, threat of imminent harm rising to the level of torture. Number two, second time certified administrator, administrative record at page 118. Gun to the head. You thought we wouldn't find you? I mean, I asked the judges to really. Put yourself in the petitioner's shoes here. You've got one of the most vicious, powerful cartels chasing you thousands of miles across Mexico and trying to kill you after they already killed your brother. I can't I can't even imagine what that feels like. And I'm arguing to the court today that that is torture. OK, I'll rest you on. OK, thank you. Thank you, counsel. We appreciate your arguments this morning. Both arguments. Thank you. We'll submit the case at this time. And thank you again very much.
judges: Paez, Korman, Vandyke